The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Our first case today is 20-1800 Ingevity Corporation v. ITC. Mr. Perry, please proceed. Thank you, Judge Moore, and may it please the Court. The Delphi engineers never conceived of the subject matter claimed in the 844 patent, and therefore the ALJ's determination of invalidity should be set aside. The 844 patent claims an emission control device with quantified adsorptive capacities of the different volumes. The first volume has a high-capacity adsorbent, and the subsequent volumes have a quantified low-capacity adsorbent. The Delphi engineers had no knowledge of the adsorptive capacities of the components of the DECS when they created that device, and that is established in Dr. Labine's testimony in Appendix 1516 and elsewhere. In fact, the ALJ found that they were unaware of, and indeed agnostic to, the adsorptive capacity of the quote-unquote honeycombs that they used in their device. Mr. Perry, this is Judge Toronto. Can I just explore a little bit this with you? I know that the better part of your brief is about a legal proposition, and I'm going to accept for current purposes that you're quite right that what the 102-G2 inventors must have is an awareness in substance of each of the now-claimed claim elements. Nevertheless, I will also, I guess, accept that the ALJ did not expressly find that the three Delphi inventors recognized the presence in the relevant honeycomb of the BWC of 3.7 grams per deciliter. Nevertheless, how was the absence of that finding prejudicial under APA 706? And if you look at 147-148 of the appendix, there's a block quotation of a letter from Westvaco that supplied these honeycombs that lists the BWC of 3.7 grams per deciliter addressed to Mr. Myler, cc'd to the two other Delphi inventors. How is it that they did not recognize the property in the letter sent to them? Three answers, Judge Toronto. First, there's no evidence that the absorptive properties as set forth in that letter were reflected in the actual honeycomb used in the DECS. Westvaco provided a number of samples. There is an inference there. Second, more importantly- I'm sorry, I thought, I guess I'm remembering maybe something from the respondents' brief, that the October 28th letter is the letter that contains those numbers, and then there's a letter on December 7th saying, here's some more same honeycombs as the last batch, plus some aluminum foil, and then the DECS start getting created, what is it, December 8th to early January. I thought it was clear that-in fact, I think on maybe page 18 of your brief, you say that that set of honeycombs was what went into the DECS. Your Honor, it is clear that the October 28th, 1999 letter identifies the honeycombs having a BWC of 3.7 grams per decaliter. The more important point is that the Delphi engineers had no appreciation of that fact or the significance of that fact at the time they built- Well, I'm sorry to keep interrupting. To some extent, I think there's an important ambiguity about the term appreciation. Appreciation can mean think it important, and it could also mean recognize the presence of. I'll stipulate that thinking it important is something that they did not do, because they didn't put it in their own patent. Nevertheless, it seems to me it's legally irrelevant, and the only question is whether they recognize the presence of a property, namely the BWC property, that you now don't dispute implies the presence of the claimed IAC property. Judge Toronto, I point the Court to Appendix 1516, which is Dr. Labine's testimony, page 95, lines 15 to 20, in which she was expressly asked, did Delphi ever perform tests on the BWC of the honeycombs? And she said no. Why not? Quote, it wasn't critical to what we were doing. So that while the information may have been available in the letter from Westvaco, it was not known to, appreciated by, important to, critical to, significant to, or otherwise pertinent to the DECS development, because they were taking these products supplied by Westvaco, putting them into the device of their creation, and of course we know from the record of invention and the subsequent patent, the Mylar patent, that they thought their invention was based on the shape, the elongate nature of the secondary canister, rather than any absorptive quality of the subsequent volume. And so we have here the case where we have two different inventions, right? The Delphi engineers worked on shape, while the Ingevity inventors developed properties. And so I think to answer your question directly, whether or not that letter was in the record, and of course it is, it was not known to the Delphi engineers at the time that that property had any significance to... But I guess I just want to push back on that. I don't understand why under any relevant case law it matters whether they thought it was significant if indeed they were aware of the property. Because conception requires that they had at that time, at the time of the claimed conception, the entire invention in mind. And the invention there is the claim of the 844 patent. Not their invention, not the Delphi's invention, but the 844 invention, which describes a quantitative, numerical threshold for the subsequent volume. And the Delphi engineers, the record is undisputed, had no knowledge of that, had no appreciation of that, and that's why it's significant, is because they never had the mental state requisite to make the invention as required. It is one of those cases where they created a different invention and went on to claim it. We know exactly what their invention was because they have a patent on it. It is not our invention. And so there's no interference between these two claims. You know, if this were a patent-to-patent interference under Section 291, it would be dismissed out of hand because there's no conflict between Claim 1 of the Mylar patent and Claim 1 of the 844 patent. And so all of the ALJ's analysis and the arguments being made by the respondents in this appeal are based on sort of hindsight reverse engineering to what might have been known, but with absolutely no evidence. And remember, because this goes to inventorship, it requires corroborating evidence of what was actually known, subjectively known, by the inventors. And Dr. Levine, in her deposition, disavowed any such knowledge. And the documentation, the record of invention, does not reflect any such knowledge. So we have here a hindsight recreation of something that didn't actually happen. Counsel, you said Dr. Levine disavowed any such knowledge. Where did that occur? Is that the appendix page 1516 that you were referring us to? That is one place where she said that the working capacity was not critical to what they were doing. There is no evidence anywhere in the record that the... Counsel, I don't think that that's a fair characterization of what she said. The question is, did Delphi ever perform tests on the honeycomb samples that Wes Zavacko sent to determine the volumetric butane working capacity? Did they ever perform tests to determine the capacity? And she said, in that time frame, in 2000. No, why not? It wasn't critical to what we're doing. But they didn't necessarily... So what she's saying is we didn't perform tests to determine the BWC, but they had already been told what the BWC was of the samples they were receiving, and it was 3.7. So she didn't think it was critical to perform tests, I guess, maybe among other things, to verify what the BWC was. But there doesn't seem to be a dispute that the ALJ found that they knew or had been informed of what the BWC is. So I guess, how do you read this section as communicating that she didn't think the BWC mattered at all? Judge Moore, I think the key point in your question is the difference between knew and been informed. The letter from Meade Wes Zavacko says what it says. There is no evidence that the Delphi engineers knew the BWC or cared about it. Well, actually, isn't the guy who got the letter one of the inventors? Yes, Your Honor, but the letter contains many other things, including the specification of the product. And the record of invention and Dr. Levine's deposition go on and on that what they appreciated as the importance of this product was its shape, its longitudinal characteristic with the channels running through it, that allowed flow of air, purge gas, to reduce the yield. And at no point did they focus on the BWC or the IAC or any other measure of the absorptive capacity because there was no interest at the time in that. They were focused on the difference in shape, and that, of course, is what the record of invention reflects. So are you telling me that it is your view under the law that if they knew they had a honeycomb structure with a BWC of 3.7 and they ultimately knew that structure was effective at reducing emission, that it's your view that the appreciation standard requires them to know that it was, in fact, the 3.7 BWC characteristic that was behind the reduced emission in order for it to qualify? Two answers to that, Judge Moore. They had to know that the absorptive capacity of the subsequent volume was related to the reduced emissions. And remember, Claim 1 has two components. It's also in series with a prior volume of a high absorptive capacity. They had no knowledge, and there's no evidence in the record that they had any knowledge of the absorptive capacity of the primary volume. We have a two-element, two-limitation claim here, method claim here. So, Mr. Perry, I don't remember you ever making this argument to us that they didn't know of the first or primary. Is that an argument that appeared in your briefs to us? Your Honor, we have taken the position that the knowledge of the subsequent volume is the critical one because it is the one that the— No, but you just said for two reasons, and your first reason was they didn't know about the first volume. Is that in your brief to us? Yes, Your Honor. Where? Where? Your Honor, we have made clear that Claim 1 involves two steps. Where did you argue to us that they did not have an appreciation of the invention because they didn't appreciate the first volume as opposed to the second volume? Your Honor, our argument has been that they did not appreciate the adsorptive capacity period full stop. Both volumes have adsorptive capacity limits. They knew nothing about adsorptive capacity. And so, you know, I don't want to get hung up on semantics, but I think that has been our argument the entire time, is that having failed to appreciate the adsorptive quality of the subsequent volume or, for that matter, the primary volume. Is there anything you can point me to in your brief that would support this, what I feel like is honestly something I've never heard before, this argument that they didn't appreciate the first IAC requirement as opposed to the second? And, Your Honor, to be clear, we have focused on the second IAC requirement precisely because of the ALJ's determination of the obviousness determination. I didn't ask what you focused on. I said is there anything at all in your brief that you can point me to that should have alerted me to the fact that you were on appeal arguing that they didn't appreciate the first IAC limit? Your Honor, I can only say this, and I'll say it again. Our position is that they knew nothing. I'm not asking your position, counsel. I'm asking you point me to something in your brief. I don't think that's the same as what is your position right now. Point me to a page in your brief. Your Honor, at reply brief 25 and elsewhere, we have said that the fact that they were agnostic to or did not know the adsorption capacity of the subsequent volume is critical. The adsorption capacity of the subsequent volume is critical for two reasons. One is because they didn't know it, and the other is because the claim itself requires a two-step comparison. I actually thought that was clear from the claim language. I don't have a page in the brief where it says exactly what I just said, but it is certainly the fact remains that they did not know the BWC, the IAC, or any other adsorption characteristic of the subsequent volume, which is what the ALJ found could be found by inference. He never actually found knowledge. And to go back to the court's question between knowledge and what information is in the record, they did not know. There's no evidence that this letter got into the knowledge as they were making the invention, and this is a conception question, not a can we reverse engineer what might have been in the record. Okay, counsel, thank you. We'll restore your rebuttal time. Let's hear from Mr. Trout. Are you going first? Yes, Your Honor, I'm going first. Okay, let's hear from Mr. Trout. So just going back to ALJ's findings here, we don't think that the ALJ found that Delphi was agnostic to BWC or IAC, but rather the ALJ's finding was regardless of, like, even if they were agnostic, it doesn't change the result. And going back to that letter that you were talking to, that you were talking about, yeah, I think it's clear that Delphi knew that BWC was 3.7, and it's also important to notice that this letter indicates that. Just to be clear, this is Judge Durando. I assume what you mean by Delphi or Delphi is the three Delphi inventors, not the company Delphi. Yes. Right. And the letter, the Dear Tom letter, is addressed to one of the three co-inventors, Myler, and it is CC'd to the other two. Correct, yes. Right, at 1160, that's where that letter appears in full, and it says CC. So there's clearly evidence that the three of them knew, though did not think important, the 3.7 figure, the BWC figure. Why did the – I realize this is not quite a kosher question, but why did the ALJ not find that? So the ALJ analogized this to TEVA, and under TEVA, he didn't think that it matters whether they knew the BWC. Because in TEVA, the problem is – Right, but part of the – I mean, just speaking for myself, part of the problem is it's truly not clear to me what TEVA stands for, and whatever it stands for, it is a little bit, or maybe even more than a little bit, hard to fit into the otherwise quite large body of law that says to conceive, or same thing, appreciate an invention, you have to in substance have in mind all the elements. So I don't think that's completely true. If you look at – so this is a situation where you have a predating actual reduction to practice. And if you look at what the test for conception is, it's that you have a sufficiently clear idea that a person with ordinary skill in the art can make the invention without – or can actually – So put aside the TEVA case. What case – and I'm not asking about the words used, because the words used in a lot of these cases have a certain generality that could mean a number of different things. What other case might involve facts that would say, yes, you can meet the appreciation of your reduction to practice standard without having in mind in substance all of the elements of the claim now at issue? So two very good cases for that are Silvestri, Silvestri v. Grant. And the facts of that case, the claims recited a limitation where there was a certain amount of water or – there's a certain amount of water that was in a bound state. And it was undisputed – or the court found that the prior inventors had no idea whether or not the water was in a bound state. But they knew that the invention met the elements of the claim. And they knew that it worked for its intended purpose. And they recognized that it was something new. And that was enough. I'm sorry, they knew that it met the elements of the claim? So that's not a counter-argument? Right. Okay. Sorry. I'm not sure I saw – I'm not sure I've seen any case, again, putting Teva aside, that would allow some higher degree of generality, of awareness of properties of the reduction to practice without awareness in substance of each of the elements that are in the claim that is at issue. Now, obviously, you're obviously right that the words used don't matter. What matters is the substance. And hence, no material difference here between BWC and IAC. I'm not questioning that. Yeah. Yeah. So to clarify, at the time of the inventors, the time the prior inventors made what they made in Silvestri, they didn't know that it met the water limitation. But after the fact, whenever it was challenged, and it was an interference case, but they relied on the actual reduction of practice for their priority date. And whenever they went back to look at it closely, they determined at that point that it did meet the claim limitation. So there wasn't knowledge at the time of the invention of the water limitation. That was later. And mycogen is another example. But isn't mycogen the one where you're just talking about the difference between thinking in codons and thinking in nucleotides? Yes. I would view that as a non-substantive difference. Well, here, a material and its properties are inseparable and they're intrinsically related. They knew that it was the material. It was important to them that these honeycombs being made, they have the shape of a honeycomb and they're made from activated carbon. And these materials intrinsically have these properties. So, I mean, there's a very close relation. I mean, like this cortisol, the material and its properties are inseparable. Right. And in the ordinary 102 case that we get from 102A, mostly 102B, from the titanium metals line of cases, if something is out there in the public domain, or at least the knowledge of it is out there in the public domain, it really doesn't matter what anybody recognized at the time. But we're talking about something that is advanced only under 102G. So there's no public domain issue. It's just invention. Can I take you back outside the doctrinal question? So we were talking extensively with Mr. Perry about, I guess, the way that I might have put it at some point. Has any prejudice been shown here by Ingevity from the absence of a finding by the ALJ that, based on the October 28th letter, the three Delphi inventors were, in fact, aware of the 3.7 BWC property of the honeycombs they put into the decks? Mr. Trow, this is Ms. Gills. I can take the question, given the switch in time, if you like. Yes, sure thing. If it would please the Court, Judge Schall, there is no prejudice here. And I disagree with Ingevity's characterization of what the Delphi inventors knew or appreciated. I think it's important to go to the language of Claim 1, which is the only claim before the Court on this appeal. That claim is a method for reducing fuel vapor emissions in automotive evaporative emission control systems using a low-capacity carbon and a high-capacity carbon. The Delphi inventors set out it was their goal. The documentation contemporaneous at the time from October of 1999 set forth their goal of a system that would reduce evaporative emissions. And that's what they did. They acquired carbons from Mead, West Vaco, a carbon manufacturer. The carbons themselves were not new, and that's important. This is not an invention to the honeycomb. The honeycomb was known. The initial absorbent volumes, either the BAX 1100 or BAX 1500, were also known. Those were carbons that were sourced. And the acronym for BAX 1100 and BAX 1500 refers to the BWC because that is how an industry at the time, people of skill and the art, characterized these carbons by their absorptive properties, by their BWC. BAX 1100 is a BWC of 11 or approximately 11. BAX 1500 is a BWC of approximately 15. And the letter in the record that the judges have referred to at Appendix 1160 to 11161, this is correspondence from West Vaco to the Delphi inventors communicating properties of the honeycomb, which in fact was used as a subsequent absorbent volume in the auxiliary canister that they built. So I think it's incorrect on the record that these inventors didn't do and achieve what they set out to do. They built the DECS containing an initial absorbent volume, a BAX 1100 or BAX 1500, and an auxiliary canister with a low working capacity carbon, the honeycomb. And even beyond the communications that went back and forth, and Your Honor has also pointed to Appendix 11162 to 11163, which says we're sending you six of these honeycombs  with a BWC of 3.7. There's no prejudice here. This is Judge Randall. That letter refers to something over and above the carbon. Is that at all relevant to the BWC property? I can be more specific, as I think I was earlier, but do you know what I'm asking? It's all yellow in the Joint Appendix, so I don't really know how much of this is confidential. The December 7, 1999 correspondence, and I think at least as to these documents, the confidentiality has been waived. At least we were able to speak to it in our brief. Okay. So it says we got some carbon and we got aluminum coil, foil, one of those two words. Does that aluminum thing have any bearing on the BWC capacity? No, no. How do we know that? I think what's key here is the Delphi inventors are requesting honeycombs to use in a system they were creating to reduce evacuative emissions. So they're asking the West Vaco team for honeycombs, and the second sentence of the letter says, these honeycomb parts have been given the sample number, and the third sentence says they were made with the same carbon formulation and cell density as the previous parts you tested, which are on Appendix 11161, where the BWC is referenced. And what the ALJ did is he said, what's the essence of the invention? The essence of the invention is the ability of that honeycomb to regenerate during purge. And this is something that the Delphi inventors recognized. Language regarding the ability of that honeycomb to regenerate during purge is referenced in their record of invention. It's referenced in the patent application, and we have numerous sites to that effect in our brief. If you look at the record of invention where they talk about properties of the invention using a honeycomb at Appendix 1448 and 1509, they talk about their invention had much greater bleed emissions efficiency than a scrubber made with a granular or pellet media and requires about one-tenth of the carbon. So they're recognizing differences between what they were using and other carbon pellets on the market. I also want to just flip to Mycogen briefly because that's a case I'm familiar with. I actually was personally at that trial in 1998 in front of Judge McKelvey because at the time I represented Pioneer Hybrid. But that case is instructive. That case involved more claim limitations with quantitative aspects than the claim won at issue here. And if I direct the court to Claims 3 and 4 of the Mycogen 600 patent, which talk about a method having at least 32% of the codons in the coding sequence of the native BT gene that have been modified, or 11%, the court didn't require those quantitative elements to be appreciated by Monsanto, only that they had created a BT gene that expressed highly in plants. Anything else, counsel? We're restoring Mr. Perry's rebuttal time, so if there's anything else you'd like to say before you conclude, you can go ahead. Are you speaking to Ms. Gills or to Mr. Perry? To you, Ms. Gills. Since we're restoring his rebuttal time, even though your little bell went off, we're giving him extra time, so if you want extra time, go ahead. Oh, sure, sure. So, again, going back to the Mycogen case, where I highlighted Claims 3 and 4, which you can see in the opinion in Mycogen at pages 1333 to 1334 of that opinion, there was no requirement by the federal circuit that the Monsanto team, in proving that they had reduced to practice a synthetic BT gene that expressed highly in plants, the whole goal was to make these plants more resistant to insects. There wasn't a requirement in their documents that they proved, at the time when they developed the genes, that it met this at least about 30% of the codons or at least about 11% of the nucleotides. So I disagree that it's simply characterizing an invention in terms of nucleotides or codons, where there was some differences there. They're the same. But the court found that the evidence there was legally sufficient under 102G. And I submit that the evidence of record, and there was an extensive record, lots of documents, testimony by the Delphi inventors, testimony by the Ingevity inventors, that support the 102G finding by the ALJ in this case, much more than what the court found legally sufficient in Mycogen. Ms. Gills, I just want to kind of understand what you view the standard that has to be met as. The record shows that the inventors knew about the BWC, but it doesn't necessarily show that they appreciated that the BWC was the reason for the reduction in emission. Is that fair? What I would say is that they appreciated the significance of the honeycomb being used as the subsequent absorbent volume. That's what they asked for. I understand. But there isn't a fact finding by the ALJ, for example, that says the inventors realized the BWC, in particular, was the reasoning for the reduced emission. Is that fair? There's no fact finding by the ALJ to that extent. I believe that that is fair. But what the ALJ found was as a technical matter, the ways in which the Delphi inventors characterized and understood their invention and what they were using was the same. And Ingevity's made-up term of IAC, IAC was not a term used by people of skill in the art. No, counsel, I understand. But I guess what I'm trying to get at is what do you think the standard is for appreciation in order to satisfy our case law? Do you believe that there has to be evidence and a fact finding that they appreciated that the BWC was the reason for reduced emission? Or is it, in your view, sufficient that they appreciated the honeycombs caused the reduced emission and one of the many properties of the honeycomb was that it had a BWC of 3.7? It would be the latter. The Delphi inventors here appreciated that they made something new and novel and that it worked for its intended purpose, which here was to reduce evaporative emissions. And they also knew that the honeycomb used as a subsequent absorbent volume, which reduced purge, allowed to regenerate during purge, was specifically recognized by them. For Ingevity to suggest that they had to quantify or specifically quantify the BWC or IAC, which are the same of that honeycomb, is not the standard, not the law, and certainly not what the court in Micogen found, nor Teva, nor Hinkle, nor any of the other cases we cite in our brief. Okay, thank you. Counsel, let's have Mr. Perry back for his rebuttal, please. Thank you, Judge Moore. To answer your last question, quote, the inventor must contemporaneously appreciate that the embodiment worked and that it met all the limitations of the interference count. That's from Cooper. Noor says the same thing, and many other cases do. You have to not only know your invention works, but that it meets the limitations of the claim. Well, I guess, Counsel, the question there is, if they knew it reduced emissions, which they seem to have known, and if they knew it had a BWC of 3.7, then it seems to satisfy that quote because the quote doesn't go further and say they had to know the BWC of 3.7 was the cause of the reduced emission. Judge Moore, they did not know the BWC was 3.7, and this goes to Judge Taranto's question. We had a trial. This was hotly contested. There was lots of evidence on both sides. The judge made no finding that they knew. In fact, the bad guys, the other side's expert, testified that Dr. Levine didn't know the BWC, and those letters in the record, the author of the letters testified that the 3.7 did not apply to the honeycombs that were in the DECS. There is no evidence that the DECS. These are incredibly important details. I need a citation for each of the things you just said. They're all collected, Judge Taranto, at Appendix 1765 to 1766 with further citations to Mr. Miller's testimony and so forth. And, for example, one example, and there are many, at Appendix 1364. Mr. Perry, slow down. I'm not going to cut your time off. As long as we have questions, we're going to let you keep going. I apologize, Judge Moore. No, that's okay. No, I want to give you a chance to answer the questions. Why don't you take us through those statements you were making, and in particular, I am currently at 1765. Show me what you go through these things one at a time, like Judge Taranto suggested, and don't worry about your time. Thank you, Your Honor. So this is a place where we have collected part of the dispute about what they knew about the BWC. At the top of 1765, we discussed this earlier, Dr. Labine testified that they never tested the BWC because it wasn't critical. We talked about that earlier. Then we know that they did not know about the BWC. Mr. Lyons, who was the respondent's expert, was specifically asked, did Dr. Labine know? Not exactly, and the testimony shows that. Wait, where is that part? Maybe I'm missing that. That's in the middle of 1765, Your Honor, and the citations here are to the administrative record rather than to this court's record, and I apologize. I can sync those up later. And can you say, what is this document that, which is obviously secondhand, what is this document that you're – This is our petition to the commission, Your Honor, where we collected the evidence on these points. It's just handy to have everything in one place. But, counsel, the hard thing is you're asking us to rely or conclude that an inventor who received a letter telling him what the BWC was didn't know what the BWC was because your expert said not exactly. No, I'm sorry, Judge Moore. I was going to get to that point next. On the next page of 1766, it collects the evidence on that. Remember, there are two letters. The question is whether the honeycomb used in the DECS had 3.7 BWC, and the author of those exhibits testified that that was not the one. They used the honeycombs from the December letter. The 3.7 was in the October letter, and the December letter did not have a BWC, and Mr. Miller testified that the December honeycombs did not have a BWC of 3.7. So it is not true. There is no evidence. Would you mind just since where in our joint appendix is the Miller testimony itself, not your assertion, not 1766? Judge Toronto, I apologize. I don't have a concordance. I believe it is in there. I just don't have it at hand, and I can certainly get that to the court. I'm sorry, and this is the 0896C? Is that what we're looking at? The 0896C and the 0902C are the two letters, the October and December letter, and then Dr. Miller testified about those letters and specifically whether the second letter was referring to the same BWC as the first letter, and he said no, and the BWC of 3.7 does not apply to the honeycomb used in the DECS. And to go back to Judge Toronto's question to my friend Mr. Trod, why didn't the ALJ make a finding? Because there was no evidence that the Delphi engineers knew of the BWC. There is a paper trail from which an inference could be drawn that they might have known, but not that they did know, and conception requires actual knowledge, subjective knowledge. They had to prove, the respondents had to prove by clear and convincing evidence, that the Delphi engineers actually knew, not that they could have known, not that it was in a file or a paper or a letter, but that they actually knew. And not only that they knew, but they appreciated the significance for the invention. And that's the disconnect I think here, and the reason the ALJ had that disconnect is that he never focused on appreciation in the legally appropriate sense. He focused on the device itself. He thought the DECS was the invention. The Commission does that in this court. But a device is not an invention. Invention is a mental step. Absolutely. I think one of the critical differences for your case is what level of appreciation is required. And I asked Ms. Gill, is it that he has to appreciate, suppose that the inventors were aware of the BWC of 3.7. Suppose that that was the BWC of the honeycombs they were using, okay? Just take that as a hypothetical. And now the question is, do they have to appreciate that the BWC is the characteristic of the honeycomb that is actually creating the reduced emissions, or is it enough for them to know that they have a honeycomb of 3.7 BWC and that it's reducing emissions? Do you understand the distinction I'm trying to draw? I do, Judge Moore, and I think the correct answer is somewhere in the middle, which is they have to appreciate the subject matter of the claim, which is that the adsorptive capacity of the second volume, whether measured by BWC or IAC, has some contribution to the reduction in bleed emissions. Okay, so I totally understand your test now. But how do you reconcile that with TEVA? That's probably, I think, the hardest case for what you're asking for. And to be clear, I think what you're suggesting is not unfair in light of other cases of ours, but in light of the decision in TEVA in particular, I'm struggling to reconcile how I could adopt the level of appreciation you want with what actually got decided in TEVA. Yes, Your Honor. And I think the line of cases that led to TEVA is important because TEVA didn't overrule them. But as to TEVA itself, I think it's important to recognize that the claim in TEVA was not to the stabilizing compound. It was to a stable composition that treated high cholesterol that contained A, an API, and B, an AGCP compound. The prior inventor knew it had a stable composition that treated high cholesterol that contained both the API and the AGCP compound. So we didn't have the debate. Counsel, the compound in TEVA contained lots of stuff. That's a comprising claim. And so we know that those are the two things that were necessary to produce a stabilized pharmaceutical composition. That's what was claimed. But what our court found in the TEVA case, it is uncontested that AstraZeneca included Crospovodone in the AstraZeneca formulation as a disintegrant but did not understand Crospovodone to have a stabilizing effect. So we held that of the many things in the AstraZeneca compound, it was in fact the Crospovodone that was meeting the claim limitation of a stabilizing effective amount. But we also held that the person, AstraZeneca, the company that was making the compound, didn't appreciate that that was the particular ingredient in the composition that was achieving that. Yes, Your Honor. Because AstraZeneca conceded to infringement, the court said that six times in its opinion so that the amount limitation was taken out of the case. And this is a comprising claim, as the court points out, and it is to a stabilizing effective amount, whereas what AstraZeneca did not appreciate was that the Crospovodone was the stabilizer. So that it appreciated it had an amount of Crospovodone, and the concession made clear that it was a stabilizing effective amount, but the fact that it was the stabilizer was not claimed. There's no claim to what is the stabilizer in TEVA. Here, in sharp contrast, Claim 1 of the 844 patent requires the subsequent volumes and the numerical limitation on IAC below it. And I think it is important. A chemical composition is different than a mechanical invention. You know, if we go back to NOR, for example, which talks specifically about mechanical inventions, where it has a feature recited as a positive limitation, conception requires a recognition of that feature. And here we have a claimed limitation, a quantitative low absorption capacity that was never appreciated, never known, never contemplated by these engineers at Delphi. And that's the difference between TEVA and here is our claim is different than the TEVA claim. It's much more like the herd versus burden situation, where the claim or the count in an interference case requires a particular limitation that the alleged prior inventor never had possession of. Okay. Oh, I'm sorry. I was going to say unless my colleagues have any other questions, but obviously Judge Trano, you do. I've got two and I hope they're quick. Just on TEVA, the claim language was a stabilizing effective amount of AGCP. Not just an amount, but a stabilizing effective amount, so that the actual claim limitation, and then it went on to do what was I think probably equally important, was and no other stabilizer. Slightly more words than that, but I'm not sure that matters. But we held in TEVA that the requirement of a stabilizing effective amount of an AGCP was met for appreciation purposes, even though AstraZeneca wasn't aware of that at the time. Well, it was aware of the AGCP and it was aware of the stability. What it wasn't aware of was the connection, and the connection was not claimed. And again, the linkage, the stabilizing effective amount, was made up in that case by the concession. And this was TEVA's argument, in fact. It's at page 1385 in the right-hand column. And the court said, we don't have to resolve that point because of the concession. Here we have no concession. In fact, these respondents leaned into the subsequent volume IAC limitation as their non-infringement position, right? That was their position before the commission, is that that is the critical limitation. And so it's the contrary of TEVA. Okay, guys, can I just ask quickly my second point? When I was looking at, this is, I guess, at 11503 of the appendix, which is where the 102G section of your post-trial hearing brief in the commission, that section of your post-trial hearing brief, I read that to say the thing that we think is missing from the relevant appreciation is an awareness of the relevant absorption capacity of, you know, let's just call it the second honeycomb. I don't read that as making any reference at all to the causal responsibility, either alone or in combination, for the bleed emission reduction. Your Honor, the claim of the 844 patent is a method for reducing bleed emissions by having the subsequent volume that has the low threshold. I understand what the claim says. And if it had been raised, there would be an interesting claim construction argument about whether each of the two steps has to make a contribution to the overall preamble claimed result. My only question is, where in, before the commission, in your relevant filing, did you make any kind of causation argument of that sort, as opposed to simply saying the Delphi inventors were not aware of or at least didn't care about absorption capacity of the, you know, low-capacity half of the process? Well, certainly that was the thrust of all of our arguments, including today, is having no appreciation of the absorptive capacity, they could never have appreciated the claim. That is our argument, start, middle, and finish, really, is that they don't know anything about absorption and its relation to bleed emissions, therefore they could not have made our invention. They made a different invention. And that's what the ALJ failed to appreciate, understand, and that's what we took to the commission, and the commission let his opinion stand, and that's why we're in this court. I mean, I'm not sure I'm answering your question, but I think that is the thrust of the entire argument is that the lack of appreciation of adsorption means that these Delphi engineers never conceived, never made the invention claimed, and therefore 102G, which is an interference provision, has no role to play here. Judge Toronto, do you have anything further? Not that I'm going to ask. Thank you. Very good. Okay, well, we're about to say this case is taken under submission, but before I do, I want to say, Mr. Perry, you slipped, and you said something rude, and, you know, I'm going to put my mom hat on for a minute and say it would behoove you at a later date, not in front of me, because you're not satisfying me by doing it, but you apologized to opposing counsel for calling them bad guys. I know it was a slip. I'm sure you wish you could take it back. It's not to me or the court you owe an apology. That's all I'm going to say. I'll never know whether you do or not. It's on you to figure out how to handle that, but I did want to let you know that it didn't go unnoticed. It is to you and to them, Your Honor, and I'll make it on the record. It was a slip and an unforgivable one, and thank you for calling me on it, and thank you for reminding me of my obligations to my friends and to the court. I do apologize to all of you. All right. This case is taken under submission.